ROGER I. TEICH
California State Bar No. 147076
290 Nevada Street
San Francisco, CA. 94110
Telephone: (415) 948-0045
E-Mail Address: rteich@juno.com

DAVID A. NICKERSON
California State Bar No. 111885
32 Bridgegate Drive
San Rafael, CA. 94903
Telephone: (415) 507-9097
E-Mail Address: nickersonlaw@comcast.net

Attorneys for Petitioner
DARREN CORNELIUS STANLEY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DARREN CORNELIUS STANLEY, | No. C07-4727-EMC |
| Petitioner, | **DEATH PENALTY CASE** |
| vs. | **DECLARATION OF COUNSEL IN SUPPORT OF FOURTH MOTION FOR EQUITABLE TOLLING** |
| RON DAVIS, Warden, San Quentin State Prison, | |
| Respondent. | **REDACTED** |

I, David A. Nickerson, declare that:

1. I am an attorney licensed to practice law in the State of California and am appointed counsel for Petitioner Darren Stanley in the above captioned habeas proceeding. This sealed declaration is made on information and belief based upon my review of the records in this case and the investigation done to date into several ineffective assistance of counsel claims. This REDACTED declaration is made in support of Petitioner's Fourth Motion for Equitable Tolling.

2. Below, I will set forth a short outline of the pertinent history of Petitioner Stanley's representation in state court before, during, and after his trial. These facts provide the context in which Stanley will assert numerous ineffective assistance of counsel claims in his finalized

petition. For instance, Stanley will assert in his finalized petition claims that he was incompetent at the time of trial, that his trial counsel were ineffective for failing to raise that issue, and that a viable insanity defense was neither investigated nor presented at the guilt phase of trial. Stanley will also assert that trial counsel failed to investigate or present a vast amount of evidence in mitigation at the penalty phase of trial. After setting forth the facts relevant to Stanley's ineffective assistance of counsel claims, I will indicate the factual gaps which remain as a result of Stanley's incompetence and trial counsel's death.

3. Stanley was arrested in Oakland on January 12, 1989. Shortly thereafter, Lincoln Mintz was appointed as his counsel. There is not known evidence that Mintz ever hired an investigator or conducted any investigation into Stanley's case. Mintz was relieved as counsel before the preliminary hearing based on a *Marsden* motion. Mintz was disbarred by the California Supreme Court in 2000. Mintz died in 2012.

4. Stanley was charged with the capital murder/robbery of Rudy Rubaclava. Rubaclava was stabbed on January 8, 1989. Stanley was also charged with eight other robberies. These robberies began on December 24, 1988 and ended on January 12, 1989, when Stanley was arrested.

5. Lead trial counsel, Walter Cannady, was appointed by the court on January 9, 1990. Walter Cannady died on August 7, 2013. On or about January 22, 1990, Cannady hired a private investigator, Brian Olivier. Richard Humphrey was appointed as co-counsel for Stanley on February 9, 1990.

6. Olivier and his associate, Clarrick Brown, interviewed numerous witnesses concerning the robberies. They also interviewed numerous witnesses concerning the Rubaclava murder/robbery, including possible alibi witnesses. As far as can be determined from their case file, Olivier and Brown conducted only guilt phase investigation. However, several witnesses interviewed by Olivier, such as Stanley's brother Issac, were called as defense witnesses at the penalty phase.

7. On April 5, 1990, just two months after Humphrey's appointment but fifteen months after Stanley's arrest, Humphrey wrote Cannady letter. [Redacted.]

8. On about April 6, 1990, Cannady hired Dr. Samuel Benson, a psychiatrist. The timing was coincidental - Dr. Benson was not hired as a result of Humphrey's letter. It also does not appear that Dr. Benson was hired as the "social historian" Humphrey requested.

9. In a declaration prepared by Cannady in support of a funding request [Redacted].

10. Dr. Benson interviewed Stanley on May 21, 1990. Stanley told Benson [Redacted].

11. Dr. Benson interviewed Stanley again on June 4, 1990. During this interview Stanley told Benson [Redacted].

12. On May 23, 1990, Olivier interviewed Stanley's brother, Issac. The interview was tape-recorded. Issac told the defense investigator [Redacted].

13. Olivier knew from police reports that Rubaclava was stabbed at a Shell gas station at the corner of 7th and Market Streets at about 3:45 a.m. on January 8, 1989. On or about June 19, 1990, Olivier's associate, Clarick Brown, interviewed Stanley. [Redacted.]

14. In the very same interview, Stanley told [Redacted].

15. On or about June 25, 1990, Cannady hired Dr. William Pierce, a psychologist.

16. Stanley's preliminary hearing ended on July 10, 1990.

17. On August 3, 1990, Cannady wrote a letter to the funding committee of the Alameda County Superior Court [Redacted].

18. Cannady's funding request was denied on August 9, 1990, for a number of different reasons including Cannady's failure to provide [Redacted].

19. On or about August 6 and 13, 1990, Dr. Pierce conducted a psychological evaluation of Stanley. In an undated document called [Redacted].

20. At the time of this evaluation, Drs. Pierce and Benson had interviewed only two members of Stanley's family or friends. They had interviewed Stanley's uncle, Reverend Joseph Hayes on June 16th and Stanley's father, Otis, on July 16th. They had reviewed no records or

documents concerning Stanley's social history such as school, prison, probation, or CYA records. No second investigator or social historian had ever been hired.

21. On August 15, 1990, Olivier wrote Cannady a memorandum setting forth a [Redacted].

22. Cannady submitted another request to the court for funds. He prepared a letter and a declaration dated August 24, 1990, in support of his request. However, these documents were not filed with the court until September 28, 1990 [Redacted].

23. Cannady's declaration further stated that [Redacted].

24. Cannady finally stated that [Redacted].

25. It appears clear that as of mid-August 1990, Cannady decided that no mental state evidence or defense would be presented at the guilt phase of trial and no further investigation would be conducted concerning such evidence. Cannady was resigned to the probability that Stanley would be convicted of first degree murder and a special circumstance making Stanley death penalty eligible and a penalty phase trial necessary. On the one hand, Cannaday said [Redacted].

26. Richard Humphrey appeared in court as co-counsel for Stanley on December 17, 1990. Humphrey made no further appearances on behalf of Stanley. Beside Humphrey's memo [Redacted] we do not know why Humphrey withdrew from the representation. Nor do we have any billing records of any counsel in the case, as Alameda Superior Court did not retain these records per their response to our subpoena in this matter. At a hearing on January 17, 1991, Cannady appeared alone as counsel for Stanley. On February 1, 1991, Richard Hove appeared as co-counsel for Stanley with Cannady still acting as lead counsel. Hove acted as co-counsel at trial which began on February 26, 1991. Hove was disbarred by the California Supreme Court in 2008.

27. After August 24, 1990, the date of Cannady's request for funds [Redacted]. The penalty phase trial began on June 11, 1991. In short, between August 24, 1990 and May 23, 1991, Dr. Pierce worked a total of eight hours and Dr. Benson worked a total of nine hours in

4

Stanley's case. Except for the interview of Reverend Hayes on November 15, 1990, these hours consisted almost entirely of the two doctors consulting with each other.

28. In a declaration filed in conjunction with Stanley's state habeas petition, Dr. Pierce stated that as "early as August 1990, my third month into Mr. Stanley's case, Mr. Cannady informed me that there were problems with securing necessary funding...In October 1990, Mr. Cannady told me to stop working until the money issue was resolved...I continued to work on the case until December 1990. I thereafter did not receive any communication from trial counsel or the investigator until May, 1991, five months later, just on the eve of my testimony." While Dr. Pierce stated that he continued to work on Stanley's case "until December", as stated above, he actually did nothing in September or October, 1990, and spent only three hours on the case in November.

29. In a letter to Superior Court Judges Taber and Kawaichi, who had been on the Superior Court's funding committee, Dr. Pierce stated, "From December 1990 until May 23, 1991, except for one attempt to visit Mr. Stanley, no services were performed nor was much information received from the attorneys concerning the case. After a five month period, the attorneys again contacted me and stated the need to prepare for the penalty phase of the case. On May 23, 1991, we met to decide what was needed."

30. In short, from August 24, 1990, when Cannady decided that the penalty phase defense would consist of the testimony of Drs. Benson and Pierce concerning Stanley's "psychological background and upbringing," until May 23, 1991, virtually nothing was done to investigate Stanley's "psychological background and upbringing." Dr. Pierce expressly stated that during this time frame "no services were performed nor was much information received."

31. Similarly in a declaration filed in conjunction with Stanley's state habeas petition, Dr. Benson said that "sometime in December 1990 defense counsel indicated that it was likely that I would not be paid for future work due to funding problems with the county...I suspended my work at that time." Dr. Benson also stated, "Defense counsel and defense investigators did not

communicate with me until May 1991, on the eve of the penalty phase, to prepare to testify in the penalty phase." He added, "due to lack of proper funding I was only prepared for trial by defense counsel in a cursory manner."

32. Trial began with jury selection on February 26, 1991. Guilt phase closing arguments were given on June 4 and 5, 1991. No mental state evidence was presented at the guilt phase. The defense asserted at trial was that Stanley had an alibi and was not involved in the death of Rubaclava.

33. Dr. Pierce wrote a one-page memorandum dated May 24, 1991. In it he stated that [Redacted].

34. Cannady filed another request for funds from the court on May 24, 1991. In this request [Redacted].

35. After meeting with Cannady and Dr. Benson on May 23, 1991, Dr. Pierce interviewed Otis Stanley (Stanley's father) and Pear Stanley (Stanley's stepmother) on June 1, 1991. He interviewed Reverend Hayes for a third time that same day. On June 8, 1991, Pierce interviewed Reverends Hayes, Jackson and Wright.

36. All of the defense penalty phase witnesses, except Drs. Benson and Pierce, testified on the afternoon of June 18, 1991. The mitigation witnesses consisted of five family members and a former Oakland police officer. Drs. Benson and Pierce testified on June 19, 1991. Cannady called himself as a defense witness on June 24, 1991. His direct examination concerned only the fact that he requested grievance hearings for Stanley at the county jail. Cannady did not attend any of these grievance hearings.

37. At the penalty phase Trenda Stanley testified that she married Stanley while he was in the county jail awaiting trial. She claimed he was a loving man and had helped her.

38. Otis Stanley was Stanley's father. Otis separated from Stanley's mother, Dorothy, when Stanley was between one and two years old. Dorothy abused alcohol and neglected her children. Dorothy died when Stanley was sixteen. Otis tried to teach Stanley right from wrong.

He disciplined Stanley and took him to church. He believed Stanley led a fairly unhappy life.

39. Pearl Stanley was Stanley's step-mother. She recalled that Stanley was always respectful. When Stanley was 11 or 12, he saved her from a house fire started by her own grandchildren.

40. Reverend Joseph Hayes was Stanley's uncle. Hayes thought Stanley was attached to his mother. While she was alive, Stanley committed burglaries and brought the money to his mother. When Hayes saw Stanley stealing he encouraged him to do the right thing and become a good citizen

41. Cynthia Williams was Stanley's cousin. She said that Stanley was always a kind person who tried to look after his brother.

42. Issac Stanley was Stanley's brother. Issac said that Stanley started using crack cocaine on a daily basis in December 1988. When under the influence of crack Stanley became a different and violent person. During the night Rubaclava was stabbed, Stanley was under the influence of crack.

43. Everett Gremminger was a former Oakland police officer. Apparently he never met Stanley. He testified concerning the effects of crack cocaine. He said that long-term use of crack caused some people to experience hallucinations and paranoia, but people who commit crimes while on crack were aware of their crimes and remembered committing them.

44. Dr. Pierce testified that Stanley had an "over-idealized self-image which covers his true feelings of fear and inadequacy." According to Pierce, when this kind of personality is under the influence of crack it would be more aggressive. He said that Stanley was on crack at the time of the offenses. Pierce said that Stanley told him that during the period he committed the charged robberies, including the robbery/murder of Rubaclava, he could no longer control his behavior, his crack addiction controlled him, and he "just started sticking people up."

45. Dr. Pierce said he interviewed the following "significant others" concerning Stanley: Reverend Joseph Hayes, Winnie Williams (Stanley's aunt), Otis Stanley, and Pearl

Stanley. Pierce also interviewed Reverends Wright and Hayes to determine "how they saw certain things happening in the community of the time from '84 to '89." However, Pierce's billing records do not indicate he ever interviewed Winnie Williams.

46. In my opinion, Dr. Benson's testimony can only be described as strange. The first 15 pages of Benson's substantive testimony on direct-examination did not mention Stanley. Instead, he described crack addiction and its effects. Over the last two pages of his direct-examination he testified that Stanley was "severely addicted to crack cocaine" at the time of the offenses. As such, Stanley was "very reminiscent of the monkey who would continually use this drug until he convulsed and died. That behavior, that drug-seeking behavior appeared to be there" in Stanley's case.

47. On cross-examination, Pierce said that Stanley showed no signs of either emotional or psychological disturbance, or any organic signs of neurological difficulties. Pierce said he "found" no history of head injury, loss of consciousness, seizure disorder, or significant hyperactivity. Benson testified on cross-examination that Stanley was not insane.

48. As noted above, Richard Hove became co-counsel for Stanley on or about February 1, 1991. The deposition of Hove was taken by the parties in 2012. Stanley's trial started with the voir dire of potential jurors on February 26, 1991, less than a month after Hove's first appearance. When asked what defense was to be presented at trial, Hove testified that "we did go on a – essentially an ID matter issue, 'I didn't do it' defense because that's what Darren (Stanley), I believe, wanted to do. (Hove deposition, pp 17-18.) When asked if he recalled statements Stanley made to defense investigators, Hove testified, "No, I don't, cause I didn't do any investigation on the case." (Hove deposition, p. 97.) Hove, added, "I never investigated anything." (Hove deposition, p. 98.) Hove similarly testified that he could not recall "him (Stanley) talking to me directly about the crime." (Hove deposition, p. 198.) When asked specifically about the penalty phase, Hove testified, "Once again I can't say - have to say I don't remember doing any investigation." (Hove deposition, p. 120.) Concerning mitigating evidence in the form of

"background information" on Stanley, Hove testified, "there were a lot of things with Darren (Stanley) that we had difficulty with because as I think I used the term, Lincoln Mintz called Darren an asshole. Darren had been an asshole all his life..." (Hove deposition, p. 122.) Why Cannady decided to present a defense based upon the assertion that Stanley "didn't do it" is not presently known. Hove suggested his retrospective belief that Stanley "wanted to do" such a defense. But Hove admitted that he conducted no investigation and he could not recall ever talking to Stanley "about the crime."

49. Based upon the above outlined facts, at the present time counsel for Stanley believe the following can be said about the investigation and presentation of the defense at Stanley's trial. These facts directly concern the ineffective assistance of counsel claims to be raised in Stanley's finalized petition.

50. No later than the meeting on August 13, 1990, Cannady decided to present a guilt phase defense that Stanley did not commit the robbery and stabbing of Rubaclava. This decision was made in spite of the fact that Cannady knew that Stanley's older brother, Issac, told defense investigators that he saw Stanley stab Rubaclava. Issac was a prosecution witness at trial. Cannady also knew that Stanley's claim that he was at a motel with an unknown "toss-up" woman, then later at his father's house, could not be corroborated in any way. For example, Stanley's father did not corroborate it, and the motel could not be identified by Stanley. Cannady additionally knew that during the same interview in which Stanley told defense investigators that he was with the "toss-up" woman he also said that he was born and raised in New York. Cannady knew that statement was not true. Cannady concluded that Stanley's guilt phase defense [Redacted]. Assuming Stanley was the one who wanted to put on the flimsy, if not outright absurd, motel-alibi defense, it is unclear whether Cannady believed he (Cannady) was obliged to put on an untenable defense because of his client's "attitude."

51. Despite believing the defense that Stanley did not stab Rubaclava would fail, Cannady decided at the same meeting in August 1990 not to investigate or present mental state

9

evidence at the guilt phase. The basis for this decision is not at all clear. Drs. Benson and Pierce had, according to Cannady, been primarily hired to deal with Stanley's erratic behavior. At that time, Drs. Benson and Pierce knew next to nothing about Stanley's social history, family history, or medical history. At that time they had no medical records, school records, probation records, prison records, or CYA records. They had interviewed only Stanley's uncle and father one time. Indeed, Cannady recognized this lack of information when he requested funds for penalty phase investigation. On the other hand several indicators of mental illness were observed by Cannady, Benson, Pierce, and Olivier. [Redacted.] In short, it is not at all clear why Cannady decided to present a defense he believed would fail, while also deciding not to investigate a mental state defense.

52. It appears that after August 13, 1990, Cannady had Drs. Benson and Pierce focus only on penalty phase investigation. Yet, nothing was done in this regard until May 23, 1991. The first penalty phase witness interviewed by Drs. Benson and Pierce after May 23 was Reverend Hayes on June 1, 1991. Hayes had been interviewed twice before. Cannady told the funding committee in his declaration [Redacted].

53. The guilt phase verdicts were returned on June 10. The penalty phase began on June 11. The prosecution rested its penalty phase case on June 12, 1991. Cannady did not have the one or two months between the guilt and penalty phases that he hoped. He actually had one day.

54. No penalty phase investigation was conducted between September 1, 1990 and May 23, 1991, except the second interview of Reverend Joseph Hayes on November 15, 1990. The next penalty phase interview was also Reverend Hayes on June 1, 1991.

55. It is not clear why Cannady conducted no penalty investigation between August, 1990 and June 1, 1991. It is not clear whether his self-inflicted problems with court funding caused him to suspend the penalty phase investigation or whether he believed he would have a month or two to investigate the penalty phase after the guilt phase ended. It is not clear what the

penalty phase defense was supposed to be. It is not clear whether anyone, Cannady, Benson, Pierce, or Olivier, ever discussed the penalty phase with Stanley.

56. As noted above, on August 15, 1990, [Redacted]. It does not appear that Cannady ever obtained any of Stanley's school records or probation records. Because Cannady failed to obtain these documents, Drs. Benson and Pierce never saw them at any time before or during Stanley's trial.

57. State habeas counsel obtained numerous medical records concerning Dorothy Stanley. These records show, among other things, that on November 28, 1974, Dorothy Stanley was hospitalized at Herrick Hospital in Oakland. Dorothy voluntarily admitted herself because she was starting to "decompensate" and had suicidal thoughts. She said she was experiencing visual hallucinations and felt things crawling under her skin. She said she didn't know why but that she wanted to kill her father's dog. She thought that the dog needed killing. The doctors at Herrick Hospital described her behavior as "passive-aggressive." She was treated with Mellaril, also known as Thioridazine, which is used to treat symptoms of schizophrenia. Her discharge diagnosis was "psychotic - depressive reaction.

58. State habeas counsel also obtained the CYA records that Cannady never obtained. These records showed that in 1985, during an amenability determination at CYA, Stanley was examined by several juvenile mental health workers. Stanley was 18 at that time. A case worker specialist, Linda Paoli, wrote "clinical impressions" of Stanley. She described Stanley as a "very impulsive, moody, and overly sensitive individual" who "has problems with authority and often views the world in a very idiosyncratic way. In other words, his perception of what is going on is often different from the perception of most other individuals." She also noted that while in CYA custody "Darren (Stanley) has experienced periodic episodes of depression related to grief over his mother's and grandfather's death and his separation from his girlfriend. His moods may vary from depression and tears to cantankerous anger." She finally noted that Stanley's past failures at CYA and on parole "may be related to his impulsivity and possible mood disorder."

59. A CYA psychologist, Dr. Larry Nicholas, also examined Stanley. He concluded: "Evidence suggesting poor reality contact, thought disturbance, and grandiose delusions was noted as well. It may well be that this defendant suffers an affective disorder such as a bipolar disorder, currently in remission, as Dr. Robinson suggests."

60. A CYA psychiatrist, Dr. Muriel Robinson, also examined Stanley. If alive, she is a critical witness to these federal habeas proceedings. In her report dated March 12, 1985, Dr. Robinson noted that Stanley had been using marijuana since the seventh grade and alcohol since he was fifteen. She noted his "undaunted optimism bordering on loss of contact with reality" which suggested "specific mood disturbance of the bipolar type." She further noted his "near-euphoric mood" and "delusional portions of the interview." Dr. Robinson diagnosed Stanley with "Atypical Conduct Disorder" and "Bipolar Disorder, Manic, in remission." In her conclusion, Dr. Robinson noted that her diagnosis of "Bipolar Disorder, Manic" was based on four factors. First, she cited Stanley's history of unusual and reckless behavior including his escape from a moving police car. Secondly, she cited the "agitation often seen during the remission phase of Bipolar Disorder. Thirdly, she cited his "rather grandiose tone" and "possible depression." Finally, she cited his near-euphoric mood" during her interview of Stanley. She also noted that she did not have a family history for Stanley which would assist her in determining "the prevalence of mood disorder in the family."

61. In an addendum to her report, dated April 16, 1985 and written approximately six weeks later, Dr. Robinson found evidence of Stanley's "distinct mood cycling" which conformed "the presence of an affective disorder." She noted that Stanley stayed in his room for two weeks during which he was described as "introverted" and "withdrawn." This was followed by four weeks of "boisterous, disruptive behavior." He was examined by Dr. Robinson during this period and found "to be in a near-euphoric mood." This period was followed by another period of introverted behavior with "withdrawal-type behavior." When examined by Dr. Robinson during this period, Stanley "appeared to be depressed, was verbally under-productive, and reported

hypersomnia again; speech and motor activity were slowed." In her conclusion, Dr. Robinson stated that "the diagnosis of 301.13 Cyclothymic Disorder have been met and replaces the Bipolar Disorder on Axis I." She recommended Lithium therapy for mood stabilization. (DSM-IV describes Cyclothymic Disorder as a fluctuating mood disturbance involving numerous periods of hypomanic symptoms and numerous periods of depressive symptoms. It usually begins early in life and is often considered to reflect a predisposition to other Mood Disorders especially Bipolar Disorders. Cyclothymic and other Bipolar disorders are more common among first degree biological relatives.)

62. After state habeas counsel obtained these documents he asked Dr. Benson to review them. He asked Dr. Benson if these documents altered his opinion of Stanley's mental health. Dr. Benson concluded that if he had this information at the time of Stanley's trial he would have found that Stanley "suffered from a psychiatric illness called Bi-Polar Disorder which is inherited, biologically based and potentially psychotic..." Dr. Benson opined that there was a "strong possibility" that Stanley was "delusional and in a full blown manic state" at the time of the capital murder and other offenses. Dr. Benson noted that from at least the time Stanley was thirteen years old he suffered from Attentional Deficit Hyperactivity Disorder. That "disease progressed to Cyclothymia, and by 1988 to full blown Bi-Polar Disorder." As a result, Stanley "probably suffered from dementia, had no ability to exercise executive functioning, could not learn from his mistakes, and became more delusional as he grew older." Dr. Benson further concluded that the "natural progression of this disease" would lead Stanley "to experience a diminution of mental functioning and emotional stability to the point of eventually he may become unresponsive to all stimulus except the most primitive, such as eating." Dr. Benson also noted that based upon the information obtained by state habeas counsel it could be said that Stanley's mother, brothers, three maternal uncles, three maternal first cousins, and other members of his family were alcoholics. Dr. Benson noted: "There is a high correlation between alcoholism and major mental illness, particularly major affective disorders, such as Bi-Polar Disorder. Alcohol is a control for manic

behavior, making a Bi-Polar person appear more normal, controlling mood swings." Dr. Benson also noted that Stanley's mother "was drinking alcohol before he was born" and that "fetal alcohol exposure can lead to mental illness and organic brain disease." Stanley's father similarly noted: "Darren's mother Dorothy Stanley was drinking heavily a few years before Darren was born. At that point, based upon my observations, she drank about two pints a day of scotch or brandy."

63. On July 16, 2013, the Court found Stanley permanently incompetent to assist counsel. Respondent's mental health expert, Dr. Daniel Martell, noted that Stanley maintains a complex and wide ranging system of bizarre delusions and that this delusional system has grown to incorporate most of the experiences and people around him. Counsel believe that Stanley has no memory of the offenses, of his conversations with his trial counsel and investigators, or of the defense presented at trial. What memory he does retain seems to be based more on his delusions than reality. As a result, counsel cannot obtain information from Stanley about the offenses. For instance, counsel cannot determine from Stanley whether or not Issac Stanley's testimony about the stabbing is accurate or whether Issac could have been impeached about his eyewitness account. Counsel cannot obtain from Stanley information about the investigation of the guilt phase defense. For instance, counsel cannot determine whether Stanley gave information to trial counsel about possible alibi witnesses, or if Stanley suggested or "insisted" upon such a defense. Nor can counsel verify the accuracy of Hove's statement that a defense that Stanley "didn't do it" was presented because Stanley wanted such a defense presented. Did Stanley's purported wish outweigh evidence of a mental state defense? Counsel cannot determine from Stanley what information was given to trial counsel about Stanley's social history, family history, medical history, or other information which was, or would lead to, mitigating evidence.

64. This lack of information from Stanley is compounded by the death of Cannady. In nearly all of his funding requests Cannady [Redacted]. Nor did Cannady explain why Stanley's attitude, rather than the trial evidence, would cause the jury to convict Stanley and sentence him to death. Was Stanley's behavior and attitude indicative of mental illness?

65. Counsel do not know why Richard Humphrey was removed as co-counsel for Stanley two months before the start of trial. Did Humphrey disagree with Cannady's decisions about trial strategy? Counsel do not presently know what input Humphrey had, if any, on the investigation of either the guilt or penalty phases. In his letter of April 5, 1990, [Redacted]. No second investigator or social historian were ever hired. Counsel do not know why.

66. Cannady was aware that Stanley had memory issues and other signs of mental illness. Nevertheless, he rejected any kind of mental state defense with little or no investigation. Counsel do not know why Cannady made this decision.

67. No later than August 24, 1990, Cannady decided [Redacted]. Yet virtually no investigation was conducted before trial concerning those issues. Counsel do not know if Cannady believed that he would have a month to two months to investigate those issues after the guilt phase verdicts were returned.

68. Cannady told Drs. Benson and Pierce to stop working on Stanley's case in October, 1990. It is not clear why Cannady did this. Was Cannady's decision based solely on his problems with funding from the court or did Cannady believe that the investigation already conducted was sufficient?

69. Cannady never obtained Stanley's CYA, prison, probation, or school records which demonstrated a history of mental illness. Why Cannady never obtained these documents is unclear.

70. As noted above, counsel intend to include in the finalized petition numerous ineffective assistance of counsel claims. For instance, the finalized petition will allege that trial counsel were ineffective for failing to raise the issue of Stanley's competency to stand trial. The finalized petition will also allege claims that trial counsel were ineffective in their guilt phase investigation and in their failure to present a mental state defense at the guilt phase of trial. Such a defense would have alleged that Stanley could not form the necessary intent for first degree murder or robbery. The finalized petition will allege that a viable insanity defense existed and should have

been investigated and presented. The finalized petition will also allege that trial counsel were ineffective for failing to adequately investigate and present mitigating evidence at the penalty phase trial. It should be noted that the vast majority of the prosecutor's evidence in aggravation consisted of testimony of Stanley's misconduct and assaults while in prison and while in the county jail awaiting trial. Evidence of Stanley's mental health issues would have greatly reduced, if not fully explained, these incidents in aggravation.

71. Counsel anticipate that Respondent's opposition to each and every claim of ineffective assistance of counsel will assert that trial counsel made informed strategic and tactical choices and were thus effective. See *Correll v. Ryan*, 539 F.3rd 938, 948 (9th Cir. 2008): "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*." As the preceding paragraphs indicate, counsel do not know why trial counsel made many of their decisions concerning Stanley's defense. For instance, counsel do not know why Cannady failed to hire a second investigator or social historian [Redacted]. Put simply, counsel know what trial counsel did, they do not know why they did it. The answers to these questions would normally come from trial counsel and the petitioner. Those sources of information are not available to counsel in this case.

73. At the very least, in order to file a finalized petition alleging ineffective assistance of counsel claims, counsel must interview the following individuals: Richard Humphrey, Brian Olivier, Clarrick Brown, Dr. Samuel Benson, Dr. William Pierce, and Dr. Muriel Robinson. Counsel will have to obtain the information they would normally obtain from Stanley and Cannady from these individuals. These interviews must take place within the next 90 days. Normally, the interviews of Stanley would have been completed long ago. Thereafter, counsel must incorporate the information obtained from these individuals into the finalized petition.

74. Counsel are not presently aware of the location of these individuals. Counsel are not even aware if any or all of them are still alive. For instance, Dr. Muriel Robinson's examinations of Stanley took place over 30 years ago. Assuming they can be located and

16

interviewed, it is anticipated that their memory of Stanley's case will be limited. Therefore, counsel will have to obtain and provide to them numerous documents in order to supply the background and context of counsels' inquiries. This process will be time consuming.

75. Additionally, it may not be possible for these six witnesses to provide all of the necessary information. Some of them may not be located. In that case, counsel would have to seek out and interview secondary witnesses and obtain additional documents. For instance, family members may have provided information to trial counsel about evidence in mitigation. Such information may have included descriptions of incidents in which Stanley engaged in behavior indicative of mental illness. This information may be gathered by way of interviews of these family members. However, even this process is further complicated by the recent deaths of Stanley's father and brother (Issac).

76. On May 10, 2013, this Court granted Stanley's motion for discovery regarding his claims that the prosecutor withheld exculpatory evidence at trial. (Docket # 97.) The Court concluded, "Good cause appearing therefore, the Court grant's Petitioner's Motion for *Brady/Napue* Preservation Discovery." The Court ordered that Stanley schedule and take the depositions of the trial prosecutor Theodore Landswick, former Alameda district attorney inspector Robert Gannon, former Oakland police officers Ignatius Chin and Michael Sitterud, and former Alameda County criminalist Alan Keel. Stanley's preservation discovery motion was granted while the stay to determine Stanley's competency was still in place. Counsel will need to complete the preservation discovery and incorporate the facts developed into the finalized petition.

77. Without additional tolling, counsel will have 127 days in which to prepare and file Stanley's finalized petition. As a result of Stanley's incompetence and Cannady's death, counsel do not believe they can develop the necessary factual basis for numerous ineffective assistance of counsel claims in that period of time. Counsel are asking for an additional 90 days because they believe that such additional time will provide them sufficient opportunity to either obtain the necessary facts or determine that such facts are no longer obtainable. Counsel believe the situation

17

present here is just the kind of extraordinary circumstance beyond the petitioner's control that justifies the limited equitable tolling being sought.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed January 25, 2016, at San Rafael, California.

/s/
DAVID NICKERSON